LAW OFFICES

*Chesnoff & Schonfeld*

AN ASSOCIATION OF PROFESSIONAL CORPORATIONS

DAVID Z. CHESNOFF, CHARTERED
RICHARD A. SCHONFELD, CHARTERED

SARALIENE S. DURRETT

520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593

TELEPHONE
(702) 384-5563

FAX
(702) 598-1425

May 20, 2013

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/22/2013

By Email

The Honorable Jesse M. Furman
United States District Court
Southern District of New York
40 Foley Square, Room 2202
New York, New York, 10007

Re:   *United States v. Alimzhan Tokhtakhounov et al.*, 13 Cr. 268 (JMF)

Dear Judge Furman,

I am writing on behalf of my client, Illya Trincher, his father and his co-defendant Vadim and his lawyer Martin G Weinberg, and his brother Eugene, also his co-defendant and his proposed counsel Donald Re.

We attach two recent articles from the NY Times which clearly quote and rely on the Title Three wire taps in our case. It is our understanding that those wire taps remain under seal. We do understand that they were temporarily unsealed for the limited purpose of the Government disclosing them for discovery to the defendants and their counsel only, however, we assume that they remain sealed for non-discovery purposes. We are very concerned that the privacy, statutory, and constitutional rights of our clients have been jeopardized by someone providing the reporters with these sealed materials. After all, the legality of the tapes has yet to be litigated and the release of this material jeopardizes our rights to a fair trial by among other things, tainting a potential jury.

We ask that you enter a protective order with respect to the tapes, transcripts and wire tap affidavits and within the Honorable Court's discretion commence an inquiry into the source of the NY Times use of the tapes. We have conferred with the Government and they have stated that the

LAW OFFICES
*Chesnoff & Schonfeld*
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS

Page-2-

Government is not the reporters' source or sources. We have also communicated with Mr. Ben Brafman, Esq. and as expected he has confirmed that neither Mr. Shechtman nor Mr. Brafman disclosed the wire taps to the reporters and they were quite surprised that the reporters had access to the transcripts and the affidavits quoted in the articles. We respectfully submit that this serious issue cannot go unchecked.

Respectfully Submitted,

**CHESNOFF & SCHONFELD**

/s/
DAVID Z. CHESNOFF, ESQ.
520 South Fourth St.
Las Vegas, Nevada 89101
(702) 384-5563
dzchesnoff@cslawoffice.net


cc: Joshua A. Naftalis/Harris M. Fischman
Assistant United States Attorneys


No later than May 24, 2013, the Government shall respond to the request for entry of a protective order with respect to the wiretap materials. In the event that the Government consents to entry of such a protective order, the Government should submit a proposed order to the Court, after conferring with defense counsel on the language of such an order. Any other defendant wishing to be heard on these issues may submit a letter to the Court no later than May 24, 2013 as well.

As for the request to commence an inquiry into the source of the media's use of the wiretap materials, the Government and counsel for Mr. Nahmad are hardly the only possible sources. If the Government complied with its representations at the April 19, 2013 conference, it produced the wiretap materials to all 33 defendants in the case several weeks ago. Between counsel and the defendants themselves, therefore, dozens of people have had access to the materials. In light of that, and the present state of the record, the Court declines to commence any inquiry at this time.

SO ORDERED.

May 22, 2013

**The New York Times**

May 16, 2013

# Case Casts Harsh Light on Family Art Business

By JAMES GLANZ, RANDY KENNEDY and WILLIAM K. RASHBAUM

For years, high-end auctions at Sotheby's and Christie's have featured a familiar tableau — members of the Nahmad family spread out in the front row, sometimes six or seven people across. Little known outside the art market but a pivotal force within it, the family, whose worth is estimated at $3 billion, has amassed one of the largest collections of Impressionist and Modernist art in the world, including one of the largest holdings of Picasso in private hands. They did it with a purchasing style that has never been subtle: they chase as many as a third of the works offered in an evening and then warehouse them for years until it is the right time to sell.

With a mix of jealousy and skepticism, competitors have often marveled at how the Nahmads have pulled this off. "They are an entity unto themselves," said James Roundell, a former director of Christie's Impressionist and modern art department in London and a longtime dealer. "They do it their way. And it's different from how other people do it or how other people are financially able to do it."

But after decades of doing business in their low-profile, idiosyncratic way, the family now finds itself in a harsh public spotlight. Last month, the F.B.I. raided the family's Helly Nahmad Gallery, an Upper East Side jewel box that traces its history back four decades in the Carlyle Hotel. As newspaper photographers gathered around, agents hauled away computers and boxes of documents as part of a sweeping investigation involving the gallery's owner, Hillel Nahmad, 34, who is known as Helly and is accused along with several others of playing leadership roles in a $100 million gambling and money-laundering network with connections to Russian organized-crime figures.

Mr. Nahmad, a night-life fixture known for his showy extravagance and celebrity crowd — a $21 million Trump Tower apartment and friendships with people like Gisele Bündchen and Leonardo DiCaprio — was charged in April in a racketeering indictment brought by federal prosecutors in Manhattan. He was accused of being part financier, part money launderer and part bookmaker in a network that organized poker games and sports betting operations and drew hundred-thousand-dollar wagers from celebrities and billionaires.

But the case, in which investigators listened to Mr. Nahmad's cellphone conversations over a

period of months, also raises questions about how he conducted himself as an art dealer. In one conversation he speaks of using the family's art business as a cover to move around illicit money, advising a woman named Lisa to wire $150,000 to the bank account of his father, David.

"Sometimes a bank needs a justification for a wire, right?" Mr. Nahmad said, according to a government account of the conversation, in March 2012. "We can just say, Oh, you are buying a painting. If they need justification, you know what I mean? You just be like, Oh yeah, I bought a, you know, Picasso drawing or something."

It is unclear whether that transaction took place, and no charges related to the use of the business to launder money are contained in the indictment. The charges describe two related gambling networks — one led by Mr. Nahmad — that laundered tens of millions of dollars through shell companies in Cyprus; legitimate hedge funds and real estate assets in the United States; a car-repair shop in Brooklyn; and even a Bronx plumbing company that had been taken over by the gambling ring as payment for a bettor's losses.

Mr. Nahmad's lawyers, Benjamin Brafman and Paul Shechtman, have denied the charges and suggest that the accusations amount to little more than run-of-the-mill gambling that does not constitute a crime.

Regardless, the raid and the attendant publicity have had an immediate effect on the Nahmads' public face in the art world. Throughout the major auctions of the last two weeks only the Nahmad children made appearances, and neither Helly nor his younger brother, Joe, bid openly. The New York gallery recently canceled a show scheduled to open in mid-May after museums grew reluctant to lend works.

## Roots of a Fortune

Information about how the family's art business actually works has been difficult to pin down. In several settings, the Nahmads have described a company called the International Art Center as their base of art transactions. But in a federal suit last year the Nahmads sought to deny any legal connection between themselves and the center. Lawyers for the other side in that case said they were not even able to determine where the International Art Center was incorporated. A Christie's invoice in the case showed the center's location as Switzerland, but the auction house redacted the city and precise address before entering the document into court records. In a deposition in another lawsuit, Helly Nahmad said the International Art Center was based not in Switzerland but in Panama.

In the past, the question of who ran the gallery itself was a matter of debate. In a 2004 lawsuit,

Helly described himself as the gallery's sole owner. But that year, in a sexual harassment lawsuit against David Nahmad that was settled out of court, the plaintiff, a gallery employee, described Helly as little more than a figurehead, and said all important decisions were made by David and his older brother Giuseppe.

The family's fortune is said to have been built in the art business, supported early on by wealth derived from family interests in banking and currency trading that date to the early 20th century in their native Syria, and later in Lebanon and Italy.

For decades, the Nahmads' buying was guided from Europe by Giuseppe, known as Joe, the eldest of three brothers who began investing in the art market in the 1950s. Giuseppe, who died last year in Monte Carlo at 80, was regarded even by critics of his commodities-trading approach to buying art as a shrewd forecaster of market values. The family's stockpiling of Impressionist works during the 1960s and 1970s, for example, paid off handsomely in the 1980s when the Japanese market boomed and the hunger for Impressionist p[...] prices to skyrocket. In the bust of the 1990s, the Nahmads reversed course a[nd went on a] buying spree.

MORE IN AR
**Art Rev**
**Today (**
Read More

For many years at auction, they rarely battled with collectors over high-profil[e works, and often] walked away with less-sought-after works, which they stockpiled in a duty-free warehouse near the Geneva airport believed to hold more than 3,000 of their paintings and sculptures.

Their business has been coveted by the major auction houses, in part because their plentiful bidding energized the sales room but also because of their deep-pocketed ability to provide third-party guarantees on certain big sales. In such arrangements, auction houses guarantee that a seller of a major work will make at least a minimum amount by arranging with a third party to purchase the work for a specific price, undisclosed to the public, should it fail to sell for more. In exchange for putting up the funds, the guarantor — who is essentially reducing the auction house's financial risk — gets a cut of any proceeds above the guarantee. Helly Nahmad's lawyer, Mr. Brafman, described the family as "among the most reliable and successful art dealers and gallery owners in the business."

Until recently, their secretiveness and reluctance to exhibit their holdings was so fierce even some family members acknowledged its effect in the art world. Hillel Nahmad's cousin — also named Hillel and also known as Helly — told The Art Newspaper in 2011 that it was a "shame" so little of their collection was known. "It is like a composer making a piece of music, and no one listens to it," added Mr. Nahmad, who is based in London and helped organize the first broad exhibition of the family's collection, more than 100 works shown at the Kunsthaus in Zurich in 2011.

## A Flashy Family Member

But as one Hillel was hoping to trumpet the family's collection, another was about to attract a different kind of attention.

Helly Nahmad of the New York gallery grew up rich in Manhattan with a knack for ostentation, driving a bright yellow BMW as a high school student, say friends who knew him then. He attended Dalton, on the Upper East Side, and according to two classmates and a former school official, was expelled in his senior year for reasons that remain unclear. (Mr. Brafman denies this, saying Helly missed school while traveling and turned down an option to repeat his senior year.)

His father set up the family's gallery at the corner of Madison Avenue and 76th Street in the early 1970s and by the time Helly took it over in 2000 (and changed its name from the Davlyn to the Helly Nahmad Gallery), the young Mr. Nahmad was known as one of more liberal spenders on the New York club scene. He spent a decade amassing apartments on the 51st floor of the Trump Tower, paying more than $21 million to string together six apartments, or almost the whole floor, The New York Observer reported early this year. "My son likes publicity a lot," David Nahmad told Forbes magazine in 2007. "I don't like publicity."

The two do, however, share an interest in gambling. David is one of the world's leading backgammon players and once instructed Helly's brother Joseph, according to The New York Observer, to take up gambling because it taught valuable life lessons.

But Helly's interest in gambling led to trouble. The high-stakes poker and sports-betting ring that he is accused of helping to lead — with activity stretching from New York and Los Angeles — ultimately came to the attention of federal authorities who were investigating Russian organized crime figures.

Mr. Nahmad helped not only to bankroll the operation, according to prosecutors, but was also personally involved in taking sports bets. In all, 34 people were indicted in the case. The lead defendant is Alimzhan Tokhtakhounov, whom authorities identify as a high-ranking Russian gangster known by his nickname, Taiwanchik. He is accused of directing an operation to launder money generated by a huge sports-betting operation in Russia and has been a fugitive since he was accused by United States authorities in 2002 of being part of a scheme to rig figure skating and ice dancing competitions at the Winter Olympics.

In a rare interview that he granted earlier this month in a Moscow restaurant, Mr. Tokhtakhounov denied any role in the ring and said he did not know the Nahmads. He acknowledged that he had placed bets ranging from $10,000 to $20,000 for himself and a few

of his friends on soccer matches with two defendants he described as friends.

"I don't know, maybe they broke some law," he said. "But they are pleasant, upstanding guys."

Mr. Nahmad has denied any wrongdoing and says, through his lawyer, that he does not know Mr. Tokhtakhounov or anyone with connections to Russian organized-crime. Mr. Brafman describes him as a "soft-spoken, respectful, concerned young man who also appears to be a true expert in the world of art."

It is not disputed, however, that Mr. Nahmad knew one of the other defendants in the case, Illya Trincher, a poker player and onetime promising tennis player whose father, Vadim Trincher, owns an apartment in the Trump Tower. The indictment describes two major crime networks that were essentially linked through Vadim and Illya Trincher and run in part out of the elder Trincher's Trump Tower apartment. At least two of Mr. Nahmad's Dalton classmates were also named in the indictment as being involved in the ring.

According to the indictment, Helly Nahmad conspired with the Trinchers to launder money generated by the United States-based betting scheme. The indictment also alleges that Mr. Nahmad induced his father to wire two huge infusions of cash, presumably to bankroll the betting operating, from an account controlled by his father in Geneva. (David Nahmad, 65, was not charged in the case.)

Coercion and physical threats were the darker side of the gambling ring, according to court papers. In a recent hearing, a prosecutor described a phone tap in which a bettor $50,000 in arrears was told about the existence of an enforcer named Maxim and warned that "he should be careful lest he be tortured."

Helly Nahmad, who had to put up his property in the Trump Tower to be released on bail, is expected to go on trial next year. In the weeks since the indictment, Mr. Nahmad has shown few signs that anything is amiss in his life or that of his family's business. On a recent Friday afternoon, his gallery was a picture of art-world decorum. Minor works by name-brand Modernists — Dubuffet, Rothko, Sam Francis — hung on the walls and Mr. Nahmad, wearing a nicely cut blue suit, swept in with an entourage of young men and made his way upstairs, where he could be heard discussing an art transaction. A few nights before that, he was spotted sitting in his regular courtside seats at a Knicks game, next to Mr. Brafman, one seat away from Spike Lee. He was cheering loudly and wearing a baseball cap emblazoned with the image of a king from a deck of playing cards.

*Colin Moynihan contributed reporting from New York, and Andrew E. Kramer from Moscow.*

**The New York Times**

May 17, 2013

# 5th Ave. Poker, With $25,000 Chips and an F.B.I. Ace in the Hole

By WILLIAM K. RASHBAUM, JAMES GLANZ and RANDY KENNEDY

The all-night games were held in rarefied settings like a suite at the Plaza Hotel. One pink chip was worth $25,000. Masseuses were on hand to help relieve the tension, while the players were fueled by food and drink. And the stakes climbed into the stratosphere, with as much as $2 million on the table to be lost or won.

At one game, in an apartment in a glass condominium tower on Fifth Avenue, as cards fluttered and chips clattered across the table, its organizers suspected that a new player did not belong, though he had arrived with a regular. The two men were asked to leave. Turned out the organizers were right: The new player was an undercover F.B.I. agent.

At roughly the same time, some of the people who helped organize the poker games were taking in breathtaking wagers on college and professional sports. One man bet $300,000 on last year's Super Bowl — and lost. Another placed a $1 million wager on another sporting event.

The description of the poker games and the wagers were among the details found in hundreds of conversations and text messages secretly captured by the Federal Bureau of Investigation, exposing the shadowy and illegal world of high-stakes gambling in New York City.

The recordings, according to court papers, were made over the last two years during an investigation into what federal prosecutors in Manhattan have characterized as two related multimillion-dollar money-laundering and gambling rings.

One of the gambling operations, which prosecutors say was led in part by the scion of a New York family that has wielded enormous power in the art market, with one of the largest collections of Impressionist and Modernist works in the world, was based in New York and Los Angeles, and served hedge fund titans, real estate magnates, celebrities and athletes.

The other, which prosecutors said was led by a Russian organized crime figure wealthy Russians living in Russia, Ukraine and elsewhere.

The scion of the New York family is Hillel Nahmad, 34, known as Helly, who w case, along with 33 other people, on April 16; he is charged with racketeering, money laundering. He was released on bail.

MORE IN N.'
**The Ap**
**Rental:**
**Fascina**
**Dwellir**
Read More

The course of the investigation is detailed in hundreds of pages of wiretap and search-warrant affidavits.

Mr. Nahmad's lawyers, Benjamin Brafman and Paul Shechtman, say their client has done nothing wrong. Mr. Brafman declined to discuss his client's secretly recorded conversations, which included one in which he speaks of using the family's art business as a cover to move around illicit money.

In it, Mr. Nahmad advises a woman to wire $150,000 to the bank account of his father, David (who was not charged), suggesting she lie about the reason, saying, "You just be like, Oh yeah, I bought a, you know, Picasso drawing or something."

Mr. Brafman said, "It is a mistake to draw any negative inference or conclusion about a case or a particular defendant based on isolated taped conversations taken out of context." Among page after page of mundane conversations about gambling and recordings of Mr. Nahmad taking bets over his cellphone were glimpses of a strange world of greed, gamblers and two classes of bettors: Those who kept wagering and who, it seemed, never ran out of money; and those who kept wagering, though it seemed they had none.

Because several of the men accused of operating the gambling rings are related — a father, Vadim Trincher, and his two sons, Illya and Eugene — some of the wiretapped conversations have an oddly homespun feel to them, even as others revealed the thuggery and threats of violence some ring members used to pressure those who would not pay.

"Have the guy call my dad tmrw at 10 a.m. he will connect him to the guy in Moscow," Eugene Trincher tells another man in a text message. Another time, a defendant in the case sends Eugene a text about a money pickup in Las Vegas: "Ur dad still need me to pick up cash in lv?"

Another man wrote to Illya to tell him that his father was cleaning up at a poker game at the Plaza in the early hours of one January morning, saying "Your dad is eating people up." He added later: "Pops won a big pot this past half, don't forget to remind him to tip the dealers, ha-ha!"

When Eugene Trincher picked up approximately $500,000 in cash from someone associated with an online gambling Web site, he brought it back to the family's apartment in Trump Tower and his brother, speaking of the cash, later told their father:

"Dad, give it to Mom for a couple of days so she'll give it to somebody else."

The affidavits, which are used by prosecutors to persuade judges to sign orders authorizing wiretaps and searches, contain details of the investigation and excerpts from conversations

recorded pursuant to earlier eavesdropping orders.

When the New York Giants won the Super Bowl in 2012, a bettor identified in the affidavits only as "Tabor" won $600,000 from the Nahmad-Trincher organization. That set off a long series of seemingly fumbling exchanges about how to move such a large sum of money without tipping off the authorities.

"Tabor sent me his wire info, I might e-mail it to you, what's your e-mail?" Helly Nahmad asked Illya Trincher on March 1. Mr. Trincher replied with a Hotmail address, but hastened to add that he had provided the wrong address. "Gmail, I mean gmail," Mr. Trincher said. The wire transfer apparently went through, but in April, Mr. Nahmad said that Tabor, fearing a trace, planned to send all the money back.

At that point, Mr. Nahmad may have revealed just how well-known the use of his father's accounts had become. "He wants my Dad to pay him, not you, so just how my Dad had paid him before when we lost," Mr. Nahmad said.

The other end of the spectrum was one seemingly hapless bettor who was referred to as "NYU Dave" by the members of the gambling ring. In March, Mr. Trincher told another of the defendants, "NYU Dave keeps calling me. This retard owes me money, and I guess he owes you money too." Prosecutors say that as the man fell $1.2 million into debt, he tried to pay it off by signing over a share of his fashion company.

In April, NYU Dave sent what appear to be frantic text messages to Mr. Trincher, including "Giving you 10 percent of my company" and "Its worth 1.2 million." Apparently feeling the heat of his debt, the man added, "I need you to payoff a few people."

The affidavits also revealed what appears to be a grim cynicism among the defendants, especially when some unfortunate bettor's life was collapsing under the weight of his gambling debts. In April, a man who appeared to be the owner of Titan Plumbing, Peter Skyllas, essentially signed his company over to the organization to save himself from over $2 million in losses. Illya Trincher joked to another member of the group that they had just gotten "some free plumbing work."