# SENTENCING SUBMISSION

## United States v. Bryan Zuriff

## 13 Crim. 268 (JMF)

Clayman &
Rosenberg LLP

305 Madison Avenue
New York, NY 10165
T: 212-922-1080
F: 212-949-8255

Hon. Jesse M. Furman
United States District Court
40 Foley Square
New York, NY 10007

Re: <u>United States v. Bryan Zuriff</u>
13 Crim. 268 (JMF)

Dear Judge Furman:

We are the attorneys for Bryan Zuriff, the above named defendant. We write this letter on behalf of Mr. Zuriff in anticipation of sentencing, currently scheduled for November 25, 2013. Based on all the facts and circumstances discussed in detail below, we respectfully request that your honor sentence Mr. Zuriff to a non-custodial sentence.

Procedural History

Bryan Zuriff was charged in the above entitled indictment and arrested at his home in Los Angeles on April 16, 2013. On July 25, 2013, pursuant to an agreement with the Government, Mr. Zuriff pleaded guilty to Count Eleven of the above entitled indictment, a violation of Title 31 USC, Secs. 5363 and 5366 and Title 18 USC, Sec. 2. Sentencing is currently scheduled for November 25, 2013.

Personal Background

Bryan Zuriff is the son of Eugene Zuriff and Ricki Tananbaum. He was born on April 16,

1969 at Mt. Sinai Hospital in Manhattan and lived his childhood on the Upper East Side. His

brother, Laurence, is two years older.

Eugene Zuriff, who is in his mid-70's, graduated from N.Y.U. Law School, but never

practiced law. Bryan's mother, Ricki, who is also in her 70's, grew up in Westchester, where she

and Eugene met. Ricki's father owned a factoring business, Century Factors, where Eugene

worked for many years.

Bryan attended The Horace Mann School through fourth grade and then transferred to

the Browning School, which he attended through high school. As will be discussed in greater

length below, Bryan struggled in school for years. He was first referred for neuropsychological

evaluation at age 6 and diagnosed with hyperkinetic reaction of childhood...what is commonly

referred to as Attention Deficit/Hyperactivity Disorder (ADHD) today. He likely had a reading

disorder as well and convinced himself at an early age that school was not relevant to his

chosen career. In spite of his struggles, he graduated high school in 1987 and attended and

graduated from N.Y.U.

In or around 1990, Century Factors suffered some significant business setbacks, causing

an enormous rift among the family members who worked there. Eugene and his father-in-law

had a falling out, resulting in Bryan's parents' separation and ultimately, their divorce. Eugene's

interest in the business was transferred to Bryan and his brother Laurence.

Bryan was always fascinated with Hollywood and "show business" and he spent his

college years pursuing his dream of working in film and theater. He enrolled at N.Y.U.'s Tisch

School's Bachelor of Fine Arts program and during college summers, worked at film and theater production companies, as well as for photographers and other artists.  Even though he was raised in an affluent home, Bryan always worked and earned his own money. He spent his junior year in college studying at U.C.L.A., learning the about the business side of the film industry. Bryan graduated from N.Y.U. in 1993 and immediately moved to Los Angeles to pursue his dream of working in show business.

Bryan arrived in Los Angeles with no job and no apartment. He slept on his friend's couch for a few months and managed to get a job as the assistant to Melinda Jason, a well-known film producer. This was Bryan's first real taste of Hollywood. About 6 months later, Bryan was hired by the legendary Hollywood talent manager, Dolores Robinson. Bryan was one of four managers who worked for Dolores Robinson Entertainment (DRE) and soon developed a slate of up and coming young talent. He managed Elizabeth Shue; Chris Noth, who was starring on Law and Order at the time, but would go on to star as "Mr. Big" in Sex and the City; Brent Spiner, a featured actor on Star Trek; and Jason Richter, the child star of "Free Willy." Bryan stayed with DRE for about 5 years and then left to start his own agency.

In or about 1998, Bryan opened Grandview Entertainment, a talent management company. He brought many of his clients with him to his new venture and was able to sign many more, including Devon Sawa of the "Final Destination" movies and Julia Stiles. Bryan ran Grandview until about 2002, when he decided to change careers.

In 1998, Bryan met his wife, Monica, while skiing in Colorado. At the time, Monica was living in New York and working as the head of U.S. sales for Versace.  After a year-long cross-

country romance, Monica and Bryan were married in April 1999. Their first child, A█, was

born in July 2000. Since A█'s birth, Monica has been a full-time, stay at home mother.

Bryan has always been an avid sports fan and always interested in betting. He began

gambling as a child, so much so that his mother took him for counseling when he was 12. When

he was in his 20s, his mother grew concerned about his gambling and sent him to Dr. ████

████████████████████ on pathological gambling. He briefly attended

therapy sessions at that time and then again about 8 years ago. As will be discussed in greater

detail below, Dr. ██████ has been treating Bryan since April 2013.  He has submitted a report

to the Court, attached at Ex. B, describing Bryan's lifelong struggle with pathological gambling.

In 2000, life changed for Bryan. Not only did he become a father, but he became a very

grateful grandson. Century Factors was sold by Bryan's grandfather and Bryan received about

$9 million in proceeds from the sale. This quick infusion of a lot of money changed the way

Bryan Zuriff and his family lived. His betting activity increased with his new found wealth.

After this windfall, Bryan decided he no longer wanted to deal with the demands of

movie stars and used his share of the Century sale to invest in real estate. He and a partner

bought, renovated, and sold a number of high end properties in the Los Angeles area.  In 2003,

he and Monica had a second daughter, M████, and in 2006, a third girl, J██████, was born.

The family moved to their current home in Brentwood in 2007.

In 2007, as the real estate market was starting to soften, Bryan decided the time was

right to return to the entertainment business. A few years earlier, while on a family vacation,

Bryan met Mark Gordon, one of the most of successful television producers in Hollywood.  Mr.

Gordon had recently divorced and was on vacation with his children, who were around the

Hon. Jesse M. Furman
November 8, 2013
Page 5

same age as the Zuriffs' children. Gordon and Bryan struck up a lasting friendship.  When Bryan

called Gordon to talk about his plans, Gordon invited Bryan to work with him. The Mark Gordon

Company is the driving force behind "Grey's Anatomy," "Criminal Minds," and more recently

"Ray Donovan."  Bryan collaborated with Mr. Gordon on a number of projects, serving as the

executive producer of "The Messenger" starring Woody Harrelson and "The Details" with Toby

Maguire. Bryan began developing "Ray Donovan," as well as a number of other television and

movie projects as soon as he began working with Gordon.

Mark Gordon is an influential force in Hollywood and through his association with

Gordon, Bryan developed social relationships with a number of Hollywood insiders. He started

playing basketball and poker with a particular well-known actor, at whose home he met Hillel

Nahmad, known to most people as Helly, and Ilya Trencher, co-defendants charged in this

indictment.  A few years earlier, Bryan started buying, selling, and collecting art. Bryan was

attracted to the world that Helly Nahmad occupied and viewed him as a shrewd and skilled high

stakes gambler and successful art dealer.  This newfound friendship was exciting and Bryan did

all he could to fit in with his new companions. Gambling was the perfect path.

Helly and Ilya were such successful gamblers that book makers in L.A. did not want to

deal with them, so they asked Bryan to find book makers that they could use to place bets.

Bryan's personal gambling had steadily increased over the years, but with his new friends, his

gambling quickly escalated. His location of "bookies" for Helly and Ilya provided him with an

avenue to bet with them and to use their betting and inside information as a guidepost for his

own bets. Through sports betting, Bryan won and lost a lot of money. All the while, he was

steadily employed and balancing work, family life, and gambling. He has been the driving force

behind a hit television show and lived his life as a loving and caring father and husband. His

fourth child and only son, J████, was born in 2011.

Bryan continues to be involved in a number of ongoing projects, including a Todd

Phillips movie to be filmed in the summer of 2014, the production of the Steve Jobs story, and a

number of other television and film projects.

Bryan was arrested in connection with this case in April 2013. In June, "Ray Donovan"

premiered on Showtime and has been a huge success.  In many ways, "Ray Donovan" is Bryan's

brainchild and he serves as the show's executive producer. After Mr. Zuriff pleaded guilty and

after the attendant publicity and press releases - which have been significant in Los Angeles -

Showtime and its parent company CBS considered suspending him. Bryan wanted to make sure

that no harm was done to his "baby," so he voluntarily resigned as Executive Producer of "Ray

Donovan."  A month later, he was asked to return to the show as a consultant and remains

deeply involved in the production of its second season. He is an integral part of the formula of

success for this show.

As will be discussed at greater length below, Bryan started treatment for a gambling

addiction soon after he was arrested. He has not placed a bet in months. He is fully committed

to ridding himself of a habit that has brought shame to his family and ruin to his reputation and

distracted him from his responsibilities at home and at work. He attends counseling sessions

three times a week and has re-focused all his energies towards his family and career.  He has

taken the first steps towards recovery.

Hon. Jesse M. Furman
November 8, 2013
Page 7

Offense Conduct

Bryan Zuriff has had a gambling problem since he was a child. After he came into
significant money, his own sports betting increased dramatically. When he met Helly and Ilya,
he not only bet more, he found a way to "double his pleasure".....to increase his stake in the
action..... by opening "sports book" accounts for Helly and others on unlawful internet
gambling sites. In other words, Bryan assisted Helly and others who were participating in
internet gambling by opening accounts for them on unlawful internet gambling sites and
accepting wagers from them. In doing so, they wired money to him through various financial
institutions to pay their bets. In this way, he not only received a portion of the proceeds of their
betting, but also used their betting strategies - their inside information - as a guide to help him
place his own wagers. This also allowed him to brag about his betting edge. Mr. Zuriff engaged
in this conduct not because he was in the business of gambling, but because he is addicted to
gambling . He is addicted to the illusion of control that gambling provides and this conduct gave
him an opportunity to feed his addiction.

It should be noted that the only people named in the indictment who Bryan knew
before his arrest are Helly, Ilya, and Noah. He had no knowledge of their alleged connection to
Russian organized crime or what other conduct his co-defendants were engaged in.

Plea Agreement

On July 25, 2013, Bryan Zuriff pleaded guilty to Count Eleven of the above entitled
indictment, a violation of Title 31 USC Secs. 5363 and 5366 and Title 18 USC Sec. 2. In
conjunction with the plea, the parties entered into a plea agreement which provided for a
stipulated guideline range of 6 to 12 months. In addition, Mr. Zuriff agreed to forfeit

Hon. Jesse M. Furman
November 8, 2013
Page 8

$500,000.00. Payment of the agreed upon forfeiture amount has been made in full.

While the agreement precludes either party from seeking any departure from the guidelines, both parties are free to seek a sentence outside the guideline range based on the factors to be considered in imposing a sentence pursuant to 18 USC 3553(a). We strongly urge the Court to impose a non-custodial sentence on Mr. Zuriff. The interests of justice do not require the imposition of a sentence within the guideline range; a probationary sentence is "sufficient but not greater than necessary" to serve the purposes of federal sentencing in this case. 18 U.S.C. § 3553(a).

The Sentencing Guidelines

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). "Underlying this tradition is the principle that the punishment should fit the offender and not merely the crime." *Pepper v. United States*, -- U.S. --, 131 S.Ct. 1229, 1240 (2011) (internal quotations and citation omitted). Courts may make an individualized assessment of the appropriate sentence.

As the Court knows, the Guidelines are now advisory rather than mandatory. *United States v. Booker*, 543 U.S. 220, 244-46, 125 S.Ct. 738, 756-57 (2005); *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005), *cert. denied*, 549 U.S. 915, 127 S.Ct. 260 (2006). Sentencing judges must now "consider" the Guidelines but are also required to consider all of the other factors set forth in 18 U.S.C. § 3553(a) in determining and imposing sentence. *Booker*, 543 U.S.

at 245-46, 125 S.Ct. at 757; *Crosby*, 397 F.3d at 112-114.  *See also Gall v. United States*, 128 S.Ct.

586, 596 (2007) ("a district court should begin all sentencing proceedings by correctly

calculating the applicable Guidelines range. . . .  The Guidelines are not the only consideration,

however. . . .  [T]he district judge should then consider all of the § 3553(a) factors to determine

whether they support the sentence requested by the party").

In *Gall v. United States,* 128 S. Ct. 586, 595-97, the Supreme Court explained that while

the Guidelines are a "starting point" and an "initial benchmark," courts "may not presume that

the Guidelines range is reasonable" or that "extraordinary circumstances" are necessary to

'justify a sentence outside the Guidelines range." *Id.* at 595. The Guidelines are now only "one

factor among several [that] courts must consider in determining an appropriate sentence."

*Kimbrough v. United States,* 129 S. Ct. 1612 (2009); *Bain v. United States*, 129 S.Ct. 2157 (2009).

Courts "must take an individualized assessment" of the appropriate sentence "based on the

facts presented" and all of the factors detailed in 18 U.S.C. Sec. 3553(a). *Gall,* 128 S.Ct. at 590.

*United States v. Johnson,* 567 F. 3d 40 (2d Cir. 2009).

"The precise weight" accorded any 18 U.S.C. § 3553(a) sentencing factor (including the

Guidelines themselves) rests within the "discretion" of the sentencing court, and the Second

Circuit "will not second-guess that determination in reviewing an otherwise reasonable

sentence." *United States v. Marshall*, 186 Fed. Appx. 125, 128 (2d Cir. 2006) (citing *United

States v. Florez*, 447 F.3d 145, 157-58 (2d Cir.), *cert. denied*, 549 U.S. 1040, 127 S.Ct. 600

(2006)).  *See also Gall*, 128 S.Ct. at 597 (appellate courts "must give due deference to the

district court's decision that the § 3553(a) factors, on a whole, justify" a non-Guidelines

sentence); *United States v. Adelson*, Nos. 06-2738-cr (L), 06-3179 (XAP), 2008 WL 5155341, at

Hon. Jesse M. Furman
November 8, 2013
Page 10

*1 (2d Cir. Dec. 9, 2008) (affirming a wide variance from the Guidelines because the district

court's "decision to impose a below Guidelines sentence was not a failure or refusal to

recognize the Guidelines, but rather a carefully considered reliance on the Section 3553(a)

factors"). Significantly, sentencing judges are authorized to consider their "own sense of what

is a fair and just sentence under all the circumstances." *United States v. Jones*, 460 F.3d 191,

195 (2d Cir. 2006).[1]

      In instructing on the practical application of *Booker*, the Second Circuit directed that

sentencing courts should: (1) determine the applicable advisory Guidelines range; and then (2)

determine, based on all the factors set forth in 18 U.S.C. § 3553(a), whether to impose a

Guidelines sentence or a non-Guidelines sentence. *See Gall*, 128 S.Ct. at 596-97; *Crosby*, 397

F.3d at 113. Indeed, if this Court "conclude[s] that two sentences equally serve the statutory

purposes of § 3553, it [cannot] not, consistent with the parsimony clause, impose the higher."

*United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006).

Bryan Zuriff's Gambling Addiction and Treatment

      As indicated above, Bryan Zuriff has been a compulsive gambler for some time. His level

of betting, both in the amount of money he wagered and in the frequency with which he bet,

increased exponentially over the last few years. What began as a serious interest in sports

betting exploded after Bryan met Helly and his friends. Bryan is a compulsive gambler and

taking bets and assisting others in placing bets was simply a way to increase "the action" and

---

[1]    *See also United States v. Bowles*, 260 Fed. Appx. 367, 369 (2d Cir. 2008) (affirming a wide variance from
the Guidelines because the district court had "considered the sentence in light of the need for deterrence,
punishment, retribution, protection of society, rehabilitation, and what would constitute the most appropriate fair,
just, and reasonable sentence under the circumstances"); *United States v. Contreras*, 247 Fed. Appx. 293, 295-96
(2d Cir. 2007) (affirming imposition of a non-Guidelines sentence because the court properly considered all of the
18 U.S.C. § 3553(a) factors).

impress others with his insider's knowledge of odds.  Over time, Bryan's betting consumed

more of his time and attention.  After his arrest, he began a regiment of therapy to deal with his

lifelong struggle with gambling.   Bryan is doing all he can to rid himself of an addiction that has

ruled and ruined his life.  We offer this as an explanation for Bryan's conduct, not as an excuse.

He accepts full responsibility for his conduct and for its consequences.

Attached hereto at Ex. A is a letter from Mr. Zuriff to the Court, describing what his life

has been like since his arrest. Bryan describes the trauma suffered by his family who witnessed

his arrest and the self-realization he's gone through since that day:

> "On April 16, 2013, I turned 44 and had the biggest wake-up call of my life when I was
> arrested and charged with crimes related to internet gambling. My family was terrified,
> my reputation was destroyed, and I had to look deep into myself and face how I created
> this disaster. Looking back, I see now that I was living two parallel lives – on the one
> hand, building a solid and respectable family and career, and on the other hand,
> escaping into a world of compulsive gambling. It is a world I am happy to leave behind."
> (See B. Zuriff letter, Ex. A)

In his letter, Bryan speaks of the terrible impact his very public arrest had on his

family...his children in particular...and the subsequent realization of the terrible impact that

gambling had on his family.

> "Until I stopped, I didn't realize how much gambling was robbing my attention from the
> areas of my life that actually provide genuine self-esteem and real joy, like my family
> and my professional goals and success. In this sense, even though this experience has
> been incredibly difficult, it has brought some positive aspects. When we are in the car as
> a family, I am now listening fully to my children, not absorbed in a game. During table
> reads for my projects, I am now concerned only about the story, not the score. I am no
> longer staring at my IPhone during school events or business meetings. As a result of
> having cleared my head, I am happier, more present and receiving the emotional
> rewards from everyday life that I was previously substituting with my gambling
> addiction." (See B. Zuriff letter, Ex. A)

Hon. Jesse M. Furman
November 8, 2013
Page 12

Dr. ███████ is a Clinical Professor of Psychiatry and Co-Director of the UCLA

Gambling Studies Program. A brief biography of Dr. ██████ as well as a letter he prepared in

connection with his treatment of Bryan Zuriff is attached hereto at Exhibit B. Bryan has been in

treatment with Dr. ███████ since April 2013. █████████████████

████████████████████████

Bryan meets 7 of the 9 criteria used to diagnose gambling disorder and as such, he is

considered a severe pathological gambler. Bryan's gambling issues are longstanding and have

progressed over the years. As indicated in his report, Bryan preferred sports betting to poker,

because he wasn't a very good poker player and because it provided him with other types of

satisfaction:



The primary negative result of Bryan's gambling was not the lost money, but rather, the

stress it engendered and the progressive lack of control. Bryan devoted so much time to

gambling that he was emotionally and physically unavailable for his wife and children. The

stress caused him to experience palpitations, difficulty sleeping, and episodes of uncontrolled

shaking. Bryan was living a double life – gambling on the one hand and a façade of normalcy on

the other:



Hon. Jesse M. Furman
November 8, 2013
Page 13

As part of his evaluation of Mr. Zuriff, Dr. ████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

In his report, Dr. ████████ describes various treatment options for Bryan. While he would normally recommend Gamblers Anonymous (GA), it is not appropriate for Bryan. Confidentiality is a concern and in L.A., and there does not appear to be a GA available for people within the entertainment field. Further, since Bryan did not experience significant monetary losses, Dr. ████████ thought Bryan would have a difficult time identifying with the other participants. In addition, he does not believe that residential treatment is appropriate, as he believes that Bryan needs to be home with his family.

Bryan currently sees Dr. ████████ three times a week. Bryan hasn't gambled in months, his longest abstinence in 20 years. He reports no cravings to gamble. ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

Hon. Jesse M. Furman
November 8, 2013
Page 14

Finally, Dr. █████ reports on Bryan's attitude towards therapy and stopping gambling:



Attached to this submission are a number of letters from Mr. Zuriff's family, friends, and colleagues. The overarching theme of all these letters is that Bryan Zuriff is a hard-working, entrepreneurial man, who is a loving husband and father. His involvement in this crime flows from his addiction to gambling and his desire to impress a group of individuals whose approval he craved. It is noteworthy that virtually every letter submitted speaks to Bryan's full acceptance of responsibility and profound remorse for his conduct.

Bryan Zuriff's Family

Bryan and Monica Zuriff have four young children. By all accounts, they are extremely devoted, involved parents who have opened their home and hearts to the community at large. Obviously, Bryan's very public arrest and indictment have been incredibly painful for his wife Monica. After Bryan's arrest, friends of their children were forbidden from associating with them and she endured whispers and stares from neighbors. In spite of all that happened, Monica stands firmly at Bryan's side and remains loving and supportive of her husband. In her letter to the Court, attached hereto at Exhibit C, Monica speaks of their special bond and the profound impact that Bryan's arrest has had on their lives:

"Bryan and I have been married for fifteen years. I first fell in love with him for his loyalty, compassion, empathy, generosity and orientation toward family. Over our years together, all those qualities have proven to be true. Our shared values have helped us

create a safe, secure, and supportive home for our children. Our children always come first, for both of us. If you had the opportunity to see our family in our home, you would see how well-rounded, well-behaved, respectful, and balanced our kids are. I give Bryan a lot of credit for our kids' great qualities. Through his openness and non-judgmental approach to people, our kids have learned to accept all kinds of people, regardless of background or status."

\*     \*     \*

"Every day, consistently, I see that Bryan is committed to the changes he has made to rectify his bad choices and keep on the right track. He attends weekly counseling sessions, has stopped contact with previous acquaintances that might have influenced his choices, and is surrounding himself with positive people. His renewed focus and lack of distraction have brought even greater joy and connection in our family. His is extremely remorseful about his actions, especially how they are affecting us. He is aware that our kids have lost friends because of this situation, and he feels mortified and heartbroken that his actions are hurting our kids. He has always worked to contribute and be a respected member of our community, and is ashamed about the loss of his reputation." (See Monica Zuriff letter, Ex. C)

Bryan and Monica's eldest daughter, A███, is 13 years old and an honors student at the

Harvard-Westlake School in Los Angeles. In her letter to the Court, attached hereto at Exhibit C,

A███ describes the trauma of her father's arrest and how he has tried to make things right for

her:

"I know my daddy did something wrong and he talked to me about what happened. He feels really really bad about it and especially how scared we all are. He promised me he would never do anything ever again that could make us worry or not feel safe. He has been talking to me a lot about how this is exactly why I have to always do the right thing and be a good example to my little sisters and brother." (See A███ Z███ letter, Exhibit C)

Included in this submission at Exhibit D, are letters from Bryan's family. Every letter

speaks of Bryan's devotion to his young children and the wonderful family that he and Monica

Hon. Jesse M. Furman
November 8, 2013
Page 16

have made. He is a devoted son, grandson, and brother. All these letters urge the Court to take

his wife and children into consideration when imposing sentence.

In addition to the letters from Bryan's parents and brother, attached hereto is a letter

from Bryan's cousin, Alan Levine. Alan's letter is written from a different perspective from

Bryan's other relatives. Alan is a former Assistant U.S. Attorney in the Southern District of New

York, and a well-respected and experienced attorney. In his letter to the Court, also found in

Exhibit D, Alan finds himself in the unaccustomed position of writing a sentencing letter on

behalf of his cousin. That letter is informed by years of experience with the criminal justice

system as well as intimate knowledge of Bryan's family and background.

Alan was the first person who Monica called after Bryan's arrest. He made

arrangements for Bryan's representation in Los Angeles and New York. He spoke with Bryan

immediately after his release and in the days that followed. His observations of his cousin, his

understanding of his background, and his knowledge of the criminal justice system are

incorporated into his letter. He notes that Bryan immediately accepted full responsibility for his

conduct and has demonstrated sincere remorse and contrition. One of the first things that

Bryan did after his arraignment was to tell his grandparents, both of whom are in their 90s,

what he had done and apologize for his behavior. Alan shares his insight into Bryan's conduct,

attributing his conduct to immaturity, rather than any "deviant personality or inability to know

right from wrong."

Alan is keenly aware of the considerations that go into a Judge's decision when

fashioning a sentence in a criminal case. "For this defendant, I genuinely believe that adequate

punishment has already been imposed and that is, the conviction and notoriety that has come

with it; Bryan knows he can never escape the word "felon" associated with his name."

Like the others, Alan notes the genuine devotion that Bryan has towards his family:

"To me, the single most impressive part of Bryan's adult life is the strength of his
marriage and the family of four children that they have created and nurtured. Virtually
no one in our extended family has four children and Bryan is thoroughly and completely
devoted to them. The affection and love in that family unit is palpable and beautiful. For
those children, particularly A███, their oldest daughter, incarceration of their father
would be devastating." (See Alan Levine letter, Ex. D)

In her letter to the Court, Bryan's mother, Ricki Conway, notes that Bryan's

childhood dream was to be in Hollywood.  She notes his deep devotion not only to his wife and

children, but his grandparents and extended family and others:

"He is equally attentive as a son and grandson. He has made room in his life for his
maternal grandparents who he regularly visits in N.Y., he calls them several times a
week….Now with his grandparents in their 90's, he looks after them as they did him.  As
a son, he is attentive and empathetic – when I was going through a divorce Bryan
offered to move back in with me so I wouldn't be alone. He was comforting during that
difficult time. Bryan has been there for all members of the family including his in-laws
who he offered to help buy a home and he aided his sister in law when she moved to
California." (See Conway letter, Ex. D)

Mrs. Conway's letter goes on to describe acts of generosity that Bryan has undertaken,

including paying the tuition of a student in school with his children who was unable to afford

the costs. "He does these things without fanfare and with no ulterior motive. He has a generous

spirit—a spontaneous generosity that is empathetic and sensitive….He has a natural inclination

to help others –it is a core quality of his personality." (See Conway Letter, Ex. D)

Bryan Zuriff's Friends and Community

Attached hereto at Ex. E, are a number of letters from friends of the Zuriff family. They

are people who have known Bryan and his family for many years and have had the opportunity

to see them in various contexts. Thomas Hudnut recently retired as President of Harvard-Westlake School and his relationship with the Zuriffs is through their involvement in their daughter's school. In 26 years at the school, he has dealt with thousands of different children and their family dynamics. He makes the following observations about the Zuriffs:

> "Fun-loving, caring, warm, empathetic and compassionate, Bryan and Monica have set a standard of decency, fair play and suitably high expectations for their family that make them a pleasure to be around. When it comes to their approach to school, there is nothing Monica and Bryan won't do – from helping out at Homecoming, to hosting a dinner at their home, to participating in the school's annual auction; they are always around and always involved. Ideal school parents, actually." (See Hudnut Letter, Ex. E)

Karen and Kerry Gordy are close personal friends of Bryan and Monica. In their letter to the Court, they describe Bryan and Monica's involvement in school and their extraordinary generosity:  "We also personally witnessed their generous philanthropy to various classrooms and families consistently over the years. They went to the financial aid office of the school and anonymously offered assistance to several families in need." Monica only confessed to providing this assistance after being confronted about her frequent trips to the financial aid office.  As the Gordys state: "They gave quietly from their hearts." (See Gordys Letter Ex. E)

As with the others, the Gordys note: "Bryan is one of the happiest dads we ever met. He is always so gentle and relaxed and so proud of his three girls before he became the very proud papa of his son J█████. It was always a pleasure for Bryan to be at the school participating somehow in his kids' daily lives or just even schlepping them, in between his busy schedule when needed, because they were so many."  Most importantly, the Gordys go on to say: "In our eyes, he is beyond a doubt, a very good man, a deeply decent, trustworthy and generous

soul......He is a beautiful light to his community and family and we humbly ask that not a minute

of this light be taken." (See Gordys letter, Ex. E)

Alan Jackson has also submitted a letter to the Court on behalf of Bryan. Mr. Jackson is a

former prosecutor in the L.A. County D.A.'s Office and currently in private practice who has

known Bryan for many years. He is completely familiar with the penal system and the goals of

sentencing. In his letter to the Court, he notes:

> "Bryan's very obvious acceptance of his responsibility for his actions, his remorse for
> having engaged in the conduct in the first place and his determination to learn from his
> mistakes demonstrate that each of the goals of the justice system will be met with a
> probationary sentence. First, because he has learned hard lessons from this incident,
> Bryan will pose no threat to the public in the future. Second, the harm to his reputation,
> the public embarrassment, and most importantly, his fallen status in his children's eyes
> have all served to severely punish Bryan. Finally, there is no question that Bryan has
> been – and others will be – deterred from any similar conduct in the future. Serving jail
> time in this case will do nothing but further debilitate his already devastated family. It
> would be a sorrowful day indeed were Bryan's children to be forced to watch him go to
> jail." (See Jackson letter, Ex. E)

Peter Berg has known Bryan for about 10 years; his son and Bryan's daughter go to

school together. In his letter to the Court, Mr. Berg notes that understands both "the

wrongness of his actions and the necessity of taking self-responsibility and never making these

kinds of judgment errors again." Mr. Berg sees Bryan as "a great father and a friend," who

"possesses a huge heart, great compassion, and real legitimate generosity." Together, he and

Bryan "have helped each other navigate the adventures of fatherhood. Bryan loves his family

and his friends and has consistently been there for both." (See Berg Letter, Ex. E)

All of the letters from Bryan's friends speak to his dedication to his family and the joy he

derives from fatherhood, his genuine remorse, and desire to do whatever he can to make this

difficult situation right.

Hon. Jesse M. Furman
November 8, 2013
Page 20

Bryan's Business Associates

As indicated above, Bryan Zuriff is a producer of films and television shows and a manager of talent. He has produced a number of films and most recently, served as the executive producer of "Ray Donovan," a Showtime series starring Liev Schreiber, John Voight and Elliot Gould, among others. The idea for "Ray Donovan" was Bryan's; he has been working on this project for years. He has been involved in every aspect of the show's creation, development, and production and is a vital part of a team effort that makes the show happen.

Bryan has poured his heart and soul into "Ray Donovan" and was devastated by the consequences that flowed from his arrest and guilty plea. Hollywood tabloids were unrelenting in their coverage of Bryan's arrest and plea and press reports greatly exaggerated his role in the indictment. Concerns were raised by CBS about Bryan's affiliation with the show, so he resigned as executive producer because he did not want the show to be associated with any bad publicity. He was devastated. In a matter of weeks, his absence from the show was felt and he was asked to return as a consultant; he is thrilled to be back.

Ann Biderman, the show's creator and co-executive producer is a powerful force in the television industry. Ms. Biderman created the show "Southland" and has been involved in the television industry for over 30 years. In her letter to the Court, attached at Ex. F, she describes Bryan's role in bringing "Ray Donovan" to television and how important his continued participation in the show is:

> "His role as a producer on this show is essential, as he has a unique skill set that is hard to duplicate. He is undeniably good with all the very different personalities and their vastly different needs. He is a good listener and is able to prioritize. He is the person that addresses various problems as they arise and he handles them with required discretion to allow the show to go on."

\* \* \*

"It would be a huge loss to me personally and professionally if he was unable to continue working on the show.  The hundreds of people that are part of this project would be impacted by his absence as well. We depend on his hard work to keep all aspects of the show moving smoothly. Bryan is a valued member of the team. If a member of the team is removed, it has a deleterious effect on all of us." (See Biderman Letter Ex. F)

Bryan's role on the show is not limited to dealing with the actors or executives. He is a "hands on" producer who engages with everyone on the show. Douglas Fox, a Property Master[2], has worked in the motion picture industry for over 30 years. He met Bryan while filming the pilot for "Ray Donovan" and was immediately impressed with him: "I have met many producers over the years, but few who I would trust or go out on a limb for. From the first location scouts I saw how much Brian cared about the project. He coordinated the crew's efforts to get the best possible results, but more importantly he became someone I could trust and go to about any problems I had."

Mr. Fox knows Bryan as a caring man, who is one of the best producers he's every worked with. He asks the Court for leniency. If Bryan is unable to continue on "Ray Donovan," he and others would be terribly disappointed. (See Fox Letter, Ex. F)

Bryan used "Ray Donovan" as a platform to bring awareness to Ovarian Cancer, incorporating it into the show. Elliot Gould's character loses his wife to the disease and then dedicates a building in her memory. In her letter to the Court, Audra Moran, the Chief Executive

---

[2] The property master is an artistic employee in film, television or theatrical production who is responsible for purchasing, acquiring and/or manufacturing any props needed for a production. The property master also works with other members of the production managing the physical appearance of the stage or set, for example they might work with the script supervisor to maintain set continuity. The property master is on staff during preproduction, develops the stylistic concept of the physical production and then continues on as a member of the physical shooting/production crew.

Officer of the Ovarian Cancer Research Fund, describes how, despite his personal legal troubles, Bryan made himself available to the organization and continued to support an event they were planning. (See Moran Letter Ex. F)

As indicated above, Mark Gordon is one of the most successful producers in Hollywood. In his letter to the Court, Mark Gordon speaks of friendship with Bryan and their successful business relationship:

> "Bryan has made a great impact on the creative work we have done together. He is a talented, thoughtful producer and a kind and encouraging leader to everyone that we work with. Not only is Bryan a successful producer, but he is the one that our cast and crew go to with their problems, He has time for everyone and there is no one better liked and appreciated than Bryan." (See Gordon Letter Ex. F)

Jon Voight is currently working with Bryan on "Ray Donovan." He met Bryan about two years ago when discussions were underway about Mr. Voight joining the cast of "Ray Donovan." He would not join the show without careful consideration of who he would be working with. In his letter to the Court, Mr. Voight describes how impressed he was with Bryan from the start and how they have become friends:

> "Since that 1st meeting I've gotten to know Bryan personally. I've spent time with his family and gotten to know his wife Monica and their 4 splendid children. We've had a lot of fun together. Bryan is a proud and doting father and a loving husband and their house is a happy one." (See Voight letter, Ex. F)

Mr. Voight describes Bryan as a constant presence on the set of "Ray Donovan" who has developed a strong bond with cast and crew. He attributes a great deal of the show's success to Bryan's efforts. He and the others involved in the show were saddened to hear of his legal troubles, moved by his honesty about his conduct, and grateful that Bryan continued to work on the show after his arrest:

"Despite the painful private challenges he was facing he was able to be there to finish over-seeing the season's last episodes. There isn't one of us who has worked with Bryan that doesn't feel he is a fine man and deserving of our loyalty. Whatever mistakes he has made I'm sure he has learned his lesson quite well, and I hope you will consider this plea for leniency from someone who knows and loves him." (See Voight letter, Ex. F)

Scott Budnick of Green Hat Films has known Bryan for many years through his work in the film industry. In addition, Mr. Budnick has been involved with the criminal justice system, as one of thirteen appointees to the Board of State Community Corrections in California. In his letter to the Court, Mr. Budnick notes Bryan's work ethic and generous spirit:

"While working with Mr. Zuriff in the film business, I have found the content of his character to be more than admirable. Our business is full of opportunists and those without a penchant for the truth and Bryan is certainly not one of those. He has been an honest and hard-working partner and collaborator."

\* \* \*

"Bryan also took a strong interest in the work that I was doing with incarcerated youth. He was always willing to lend a helping hand and volunteer for the three nonprofits I work with. He also has always been willing to mentor struggling men and women who want to get into the entertainment business, but don't have the resources or connections." (See Budnick letter, Ex. F)

Finally, like all the other letters submitted on behalf of Bryan Zuriff, Mr. Budnick notes that Bryan is a wonderful father and husband and a man that cares "deeply about the less fortunate. His conduct in this case is in no way demonstrative of his true character and I hope you would be willing to show mercy that punishes proportionally, but also allows Bryan to continue in his role as a husband, father, and philanthropist." (See Budnick letter, Ex. F)

## The Court Should Impose a Non-Jail Sentence

Bryan Zuriff is first and foremost a loving father and husband. He is a successful and hardworking producer and has a bright future in the entertainment industry....a world he loves

Hon. Jesse M. Furman
November 8, 2013
Page 24

and has always loved. He is part of a large team and his participation is, by all accounts, key to its success. Incarceration would necessarily cause enormous disruption to the team effort of production of this show and permanently stigmatize him in Hollywood.

Bryan Zuriff is also an addict. His addiction, his loss of control, his preoccupation with gambling and irrational thinking, his continuation of behavior despite adverse consequences are the definition of addiction. He has and he will continue to address his gambling addiction, the root cause of his involvement in this case. He is committed to living a full and happy life without the burden that gambling placed on him and his family.

As demonstrated by many of the letters submitted on his behalf, Bryan took full and immediate responsibility for his conduct in discussions with friends and family members. He also took full responsibility for his conduct by virtue of his plea. As Your Honor knows, Mr. Zuriff was the first of over 30 defendants charged in this indictment to enter a guilty plea in this case. He did so because he wants nothing more than to address this situation head-on, deal with his demons, and put this terrible chapter of his life behind him. He has done all he can to assure this Court and his family that he will never engage in criminal conduct again. He has done all he can to assure his children that they need not fear that their father's conduct will again frighten them or make them feel insecure.

Mr. Zuriff will have to face the rest of his life with the stigma of a felony conviction. He has already suffered the humiliation of extensive press coverage surrounding his arrest and plea. His reputation has been ruined. He has a lot of work to do to restore his good name and he is intent on doing so. He is going through this painful process with the full support of his friends and family.

Hon. Jesse M. Furman
November 8, 2013
Page 25

Bryan Zuriff is a man with a stable, supportive and loving family. He is kind and generous and caring and he has a problem. Prison is not the solution to that problem. Continued intensive therapy is what has helped him and will help him in the future. The only appropriate sentence in this case is one that does not include incarceration.

Conclusion

In light of all the circumstances of this case, including Mr. Zuriff's background, family, career, treatment, and future, we respectfully request that the Court impose a sentence on Mr. Zuriff that is fair, just, and merciful. We urge the Court to review all the letters submitted and to take their comments about Bryan Zuriff to heart and to impose a non-custodial sentence.

Thank you for your attention to this matter.

Very truly yours,

Isabelle A. Kirshner       Charles E. Clayman

cc: Joshua Naftalis, Esq.
    Harris Fischman, Esq.